AO 106 (Rev. 12/03) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT

SOUTHERN                                    DISTRICT OF CALIFORNIA

**UNSEALED 4/18/08**

**ORDERED SEALED BY COURT**

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

1047 Elk Run Place
Chula Vista, CA

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

Case Number: '08 MJ 0688

I, Special Agent Christopher J. Sedmak                                       being duly sworn depose and say:

I am a(n) Special Agent for the Federal Bureau of Investigation            and have reason to believe
         Official Title

that  ☐ on the person of or   ☑ on the property or premises known as (name, description and/or location)

See Attachment A.

in the  SOUTHERN                          District of   CALIFORNIA

there is now concealed a certain person or property, namely (describe the person or property to be seized)

See Attachment B.

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

Evidence of a crime and property used in committing a crime; contraband, fruits of a crime, and things criminally possessed; and propery designed or intended for use or which is or has been used as a means of committing a criminal offense.

concerning a violation of Title  21 / 18      United States code, Section(s)  841(a)(1), 843(b) and 846 / 1956

The facts to support a finding of probable cause are as follows:

See the attached Affidavit of Special Agent Christopher J. Sedmak

Continued on the attached sheet and made a part hereof:   ☑ Yes   ☐ No

_Chrif J. Sedmak_
Signature of Affiant

Sworn to before me and subscribed in my presence,

March 4, 2008                                               at   San Diego, California
Date                                                              City                          State

Hon. Cathy Ann Bencivengo         U.S. Magistrate Judge
Name of Judge                     Title of Judge            Signature of Judge

# ATTACHMENT A

## DESCRIPTION OF PROPERTY TO BE SEARCHED

The premises located at 1047 Elk Run Place, Chula Vista, California is a two-story single family residence located on Elk Run Place in Chula Vista, California. The residence has a peach-colored stucco exterior and a brown shingled roof. The numerals "1047" are visible on the exterior wall of the residence to the right of the garage door, facing Elk Run Place.

The search shall include all rooms, attics, crawl spaces, safes, briefcases, storage areas, containers, garages, sheds, carports, storage facilities and containers such as safes, vaults, file cabinets, drawers, luggage, briefcases, valises, boxes, jewelry boxes, cans, bags, purses, trash cans and vehicles located on or near the premises, that are owned or under the control of the occupants of such premises, evidenced by prior surveillance, possession of keys, maintenance paper work, title, insurance papers, or registration for such vehicles in the name of the occupants including: (1) a black 2003 Land Rover bearing California license plate number 5MFE904, and (2) a black 1988 Toyota truck bearing California license plate number 3P13894.



## ATTACHMENT B

## ITEMS TO BE SEIZED

1. Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

2. Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

3. ~~Weapons, firearms, firearms accessories, body armor, and ammunition and documents relating to the purchase and/or possession of such items.~~

4. Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining false identification including birth certificates, drivers license, immigration cards and other forms of identification which the same would use other names and identities other than his or her own.

5. All incoming telephone calls received at the residence during the execution of the search warrant and all calls received on cellular telephones found during the execution of the warrant.

6. Devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors and recording devices and cameras.

7. Photographs and video and audio recordings which document an association with other coconspirators and/or which display narcotics, ~~firearms~~, or money and proceeds from narcotics transactions.

8. Packages and contents that were delivered to the residence, or were about to be sent by the occupants.

9. ~~Drug paraphernalia to include: distribution materials including scales, plastic baggies, electrical and duct tape, and other odor masking materials.~~

10. Police radio scanners, pagers, cellular telephones, facsimile machines, telephone answering machines, Caller ID system, and prepaid telephone cards.

11. ~~Travel documents including itineraries, airline tickets, boarding passes, motel and hotel receipts, rental car receipts, passports and visas, credit card receipts, shipping and receiving documents relating to the delivery of packages.~~

1

12. Banking and financial institution records, bank statements, credit card statements, canceled checks, money orders, deposit slips, orders for or receipt of money transfer by wire, checking and saving books, financial institution statements, safe deposit boxes, loan statements, tax returns, business and personal ledgers, and accounting records.

13. Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States Currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

14. Records relating to the lease of storage lockers, telephone/address directories and other papers containing telephone numbers and addresses.

15. Records related to the purchase of real estate, vehicles, precious metals, jewelry and other tangible assets.

16. ~~Automotive parts and devices used to create clandestine compartments to hide large quantities of drugs and/or currency.~~

17. Digital storage devices including: floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magnet optical cartridges, personal digital assistance, pagers, money chips, thumb drives, jump drives, flash drives, portable hard drives and computers containing hard drives. All electronic devices, such as computers, which include the central processing units, internal and external devices, internal and external storage equipment or media, terminals or video display units, together with peripheral equipment, such as keyboards, printers, modems, and programmable telephone dialing devices, and operating system software, program software, applications software, manuals for the software and hardware, electronic organizers, or personal digital assistants and computer discs and CD's, cellular telephones and SIM cards. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

18. With respect to any and all electronically stored information in cellular phones and PDAs, agents may access, record, and seize the following:

   a. telephone numbers of incoming/outgoing calls stored in the call registry;

   b. Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

   c. Any incoming/outgoing text messages relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, and money laundering offenses under 18 U.S.C. § 1956;

   d. telephone subscriber information;

   e. the telephone numbers stored in the cellular telephone and/or PDA; and

   f. any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, e-mail, and voice mail relating to controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), 846, and money laundering offenses under 18 U.S.C. § 1956.

# AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

UNITED STATES OF AMERICA  )
                          )  SS
SOUTHERN DISTRICT OF CALIFORNIA  )

I, Christopher J. Sedmak, being duly sworn, hereby depose and say:

1. I make this affidavit in support of an application for a search warrant in furtherance of an investigation conducted by special agents of the Federal Bureau of Investigation ("FBI") and the United States Drug Enforcement Administration ("DEA") for the premises located at 1047 Elk Run Place, Chula Vista, California (hereafter "the target location") described further in Attachment A.

2. JESUS MACIAS (hereafter "JESUS") and JUAN ERNESTO MACIAS, JR. (hereafter "JUAN") are brothers who reside at the target location. On February 22, 2008, JESUS and JUAN were indicted in Criminal Case No. 08CR0509-BEN and charged with conspiracy to distribute oxycodone[1] and hydrocodone bitartrate[2] in violation of 21 U.S.C. §§ 846 and 841(a)(1), and multiple counts of distribution of oxycodone and hydrocodone bitartrate in violation 21 U.S.C. § 841(a)(1).

3. The purpose of the search warrant is to seize (1) property that constitutes evidence of the commission of controlled substances offenses under 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and money laundering offenses under 18 U.S.C. § 1956, (2) contraband, fruits of crime or things otherwise criminally possessed, and (3) property designed or intended for use or which is or has been used as a means of committing a criminal offense.

---

[1] Oxycodone is a potent and potentially addictive opioid analgesic medication synthesized from thebaine. It is a Schedule II controlled substance both as a single agent and in combination with other products such as acetaminophen, ibuprofen, or asprin.

[2] Hydrocodone is a narcotic which relieves pain by binding to opioid receptors in the brain and spinal cord. Pure hydrocodone, and forms containing more than 15 mg per dosage unit, are Schedule II controlled substances. Controlled purchases and seizures conducted over the course of this investigation to date have involved commercially prepared tablets of hydrocodone bitartrate with acetaminophen, consisting of less than 15 mg hydrocodone per dosage unit and constitute Schedule III controlled substances. All references found herein to "hydrocodone" refer to tablets consisting of hydrocodone bitartrate with acetaminophen.

4. The information contained in this affidavit is based on my personal experience and training, consultation with other special agents of FBI, DEA, the Criminal Investigation Division of the Internal Revenue Service ("IRS"), officers of the San Diego Police Department ("SDPD") and other law enforcement officers. The evidence and information contained herein was developed from a review of intercepted wire and electronic communications pursuant to prior district court authorization, interviews with sources of information, financial documents secured by grand jury subpoena, surveillance records, vehicle records from the California Department of Motor Vehicles ("DMV"), and public records.

## EXPERIENCE AND TRAINING

5. I have been employed as a Special Agent with the FBI since September of 2002. I am currently assigned to the San Diego Field Division working as a member of the San Diego Organized Crime Squad. I have received 16 weeks of training at the FBI Academy in Quantico, Virginia. During the training, I learned how controlled substances are manufactured, consumed, packaged, marketed, and distributed. I have interviewed and operated informants, executed search warrants, arrested and interviewed subjects, conducted physical surveillance, utilized electronic and video surveillance, and testified in federal and state courts. I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug trafficking.

6. In the course of my law enforcement experience, I have participated in investigations of crimes involving the importation and distribution of controlled substances and money laundering. I have arrested and participated in the arrests of numerous individuals for various controlled substance violations. I have participated in the execution of search warrants relating to illegal drug offenses. I have received training in the methods used by drug traffickers to import and distribute conceal controlled substances and launder drug proceeds to promote the drug trafficking activity and conceal or disguise the nature, source, and ownership of the drug proceeds. I have conducted and participated in numerous investigations involving surveillance of individuals associated with drug trafficking. I have conducted and participated in numerous interviews of individuals involved with drug trafficking.

7. Based upon my experience and training, consultation with other law enforcement officers experienced in controlled substances and financial investigations, and all the facts and opinions set forth in this affidavit, I know that:

    a. Individuals involved in drug trafficking often maintain at their residence records and ledgers evidencing their trafficking activities in order to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances. At times, the drugs may be sold, but documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and coconspirators.

    b. Individuals involved in drug dealing must often rely on others to obtain the controlled substances and to help them market the drugs and evidence of the identities of these criminal associates is often maintained at their residence and/or place of business.

    c. Individuals involved in drug dealing utilize cellular telephones and personal digital assistants ("PDAs") to maintain contact with co-conspirators and to conduct their criminal activity. Drug traffickers use cellular phones and PDAs, in part, because of their belief in the inability of law enforcement personnel to simultaneously track the originating and destination phone numbers of calls placed to and from their cellular phones and PDAs. Cellular telephones and PDAs contain wire and electronic data concerning telephonic contact, text messages, and electronic mail messages with co-conspirators, as well as telephone books containing contact information for co-conspirators. Members of drug trafficking and distribution organizations also utilize cell phones and PDAs with photograph and video capabilities to take photographs and videos of other members of drug trafficking and distribution organizations, drugs, money, and assets purchased with drug proceeds.

    d. Based on prior searches of premises used by individuals involved in drug trafficking, I believe I will find articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

    e. Individuals involved in drug trafficking will often conceal contraband and evidence of their drug dealing in vehicles outside their residence in order to prevent detection and seizure by officers conducting search warrants at the residence.

f. Individuals involved in drug trafficking earn sums of money and often maintain large amounts of United States Currency at their residence and often hide United States Currency in safes, false compartments, and other locations inside their home. Individuals involved in drug trafficking also try to conceal and disguise the nature, source, and ownership of drug proceeds in a variety of ways including: (1) placing assets in names other than their own to avoid detection while maintaining control; (2) laundering the money through what appears to be a legitimate business or businesses; and (3) using the money to buy assets which are hard to trace. Substantial sums of United States Currency and records of financial transactions are often found at the residence maintained by drug traffickers.

g. Individuals involved in drug trafficking often send and receive packages that contain contraband, money orders, and United States Currency. Packages that contain contraband, money orders, and United States Currency are often found at residences maintained by drug traffickers.

h. Individuals involved in drug trafficking will often maintain weapons, firearms and ammunition on their person or at their residence and cars in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings. These weapons and firearms are used and can be used as an instrumentality of the drug trafficking and money laundering crimes.

i. Individuals involved in drug trafficking often take photographs of themselves, their associates, their property, and their controlled substances. Drug traffickers often maintain these photographs at their residences or in their vehicles. Therefore, I am requesting permission to search the residences listed within this warrant and it's attachment(s) for and to seize photographs that law enforcement agents determine to be of evidentiary value.

j. Individuals engaging in drug transportation often use computers to communicate with co-conspirators by means of electronic mail ("e-mail") and for the storage of records. Moreover, I know that digital evidence can be stored on a variety of systems and storage devices including: hard disk drives, floppy disk, CD ROMS, DVD ROMS, magnetic tapes, magneto optical cartridges, personal digital assistance, pagers, money chips, thumb drives, flash drives, and portable hard drives. Therefore,

1  I am requesting permission to seize computers, including printers, monitors, keyboards, scanners, and
2  all forms of media storage that may be found at the residence.

3      8.    It is also my opinion and belief that the above-described documents are permanently
4  possessed by drug traffickers much the same way a legitimate business will maintain records and tools
5  of its trade whether or not the business has a particular item in inventory on a given date. These
6  documents are kept by drug traffickers whether or not the trafficker is in possession of any drugs at any
7  given moment. I believe that the seizure of such documents will provide evidence of the events set forth
8  in this affidavit and that such documents can be found in the residence despite any lapse of the time
9  between the events described and the anticipated search pursuant to this warrant.

10      9.    The investigation into the criminal activities of JESUS, JUAN, and others reveals that
11  the drug distribution activities have been extensive and ongoing for several months. Agents are also
12  aware that JESUS and JUAN have stored pharmaceuticals at the target location, most recently as
13  January 23, 2008. Due to the quantities of controlled substances distributed, and the assets acquired by
14  JESUS and JUAN, I believe that JESUS, JUAN, and others have been engaged in drug trafficking and
15  possibly money laundering for a long period of time. Consequently, I believe that there will be current
16  as well as historical records of drug trafficking at the target location.

## OVERVIEW OF THE TARGET SUBJECTS

18      10.    The following is a brief description of JESUS and JUAN, the target subjects whose
19  drug trafficking activities provide probable cause for the search warrant on the target location.

20      a.    **JESUS MACIAS**, aka "Jessie" (date of birth: 12/24/1983) is a pharmacy
21  technician at Galloway Pharmacy. JESUS used his position as a pharmacy technician to obtain and sell
22  distributable quantities of oxycodone and hydrocodone. JESUS distributed oxycodone and hydrocodone
23  to his brother JUAN and others for further distribution.

24      b.    **JUAN ERNESTO MACIAS JR.**, aka "Johnny" (date of birth 07/06/78) received
25  distributable quantities oxycodone and hydrocodone from his brother JESUS and sold oxycodone and
26  hydrocodone to others for further distribution.

## FACTS ESTABLISHING PROBABLE CAUSE

11.   During approximately May of 2007, confidential source of information ("CI")[3] for the FBI met JUAN while playing poker at a friend's house San Diego, California. The CI noticed that JUAN passed out Cialis tablets (a male enhancement drug) to the poker players. One of the card players told the CI that JUAN "sells them" [pills]. The CI asked JUAN if JUAN could get "yellas" [hydrocodone tablets]. JUAN replied, "I can get you as many as you want." The CI then said "Give me 20 bottles." JUAN then reacted to the CI as though the CI was joking. One of the poker players then told JUAN that the CI was not joking. Soon thereafter, the CI and JUAN left the poker table to talk amongst themselves. During their conversation, JUAN told the CI that he could supply the CI with bottles containing 500 hydrocodone tablets. The CI then asked JUAN how much it would cost per bottle. JUAN responded $700 per bottle. The two then exchanged telephone numbers. The CI told JUAN to call the CI when JUAN wanted to "do business."

12.   On July 20, 2007, JUAN called the CI and said that he was ready to "do business." JUAN than clarified that he had "those yellow [hydrocodone] pills." The CI met with JUAN at Fashion Valley Mall in San Diego, California and JUAN showed the CI a bottle containing hydrocodone and another bottle containing 80 milligram tablets of OxyContin (a brand of oxycodone). JUAN told the CI that he wanted $2,500 per bottle of OxyContin. JUAN also told the CI that he wanted $700 per bottle of hydrocodone if the bottle belonged to him, and $1,000 if the belonged to his brother. JUAN told the CI that his brother worked at a pharmacy in San Diego, California.

---

[3]   The CI pled guilty to felony drug charges in state court and is awaiting sentencing. On April 17, 2007, the CI entered into a Cooperation Agreement with the FBI and the San Diego District Attorney's Office. Pursuant to the agreement, the CI agreed to plead guilty to felony charges in state court and assist law enforcement in return for a possible reduction in sentencing. On November 26, 2007, the San Diego District Attorney's Office concluded the Cooperation Agreement by telling the CI that he will not receive any further punishment for his/her state felony charges as a result of the cooperation the CI had provided thus far. The CI then entered into a second Cooperation Agreement with the FBI and the San Diego District Attorney's Office. Pursuant to the second Cooperation Agreement, the CI agreed to continue to assist law enforcement in return for a reduction of his/her felony state charges to a misdemeanor. As of December 5, 2007, the CI has been reimbursed $2,100 by the FBI for his/her expenses. The information provided by the CI has been corroborated and has proven to be reliable.

6

- **July 27, 2007 – 2 Bottles of Hydrocodone and 2 Bottles of Oxycodone**

13. On July 27, 2007, JUAN sold two bottles of oxycodone (each bottle containing 100 tablets of 80 mg of oxycodone tablets) and two bottles hydrocodone (each bottle containing 500 tablets) to the CI for $5,000. JUAN also provided the CI with a small bottle that contained 18 hydrocodone tablets. After the controlled purchase was completed, agents observed JUAN meet with JESUS.

14. On September 26, 2007, the CI, JESUS, and JUAN met at the Oceanaire Restaurant in the Gas Lamp District of San Diego to discuss future pharmaceutical transactions. JESUS said he could provide the CI with two to four boxes of hydrocodone every couple of weeks and said that he would do his best to obtain oxycodone.

- **September 29, 2007 – 8 Bottles of Hydrocodone and 2 Bottles of Oxycodone**

15. On September 29, 2007, JESUS sold two bottles of oxycodone (each bottle containing 100 80 mg tablets) and eight bottles of hydrocodone (each bottle containing 500 10mg tablets) to the CI. JUAN was also present during the pharmaceutical deal.

- **October 7, 2007 – 4 Bottles of Hydrocodone and 3 Bottles of Oxycodone**

16. On October 6, 2007, monitors intercepted a series of calls from ISABEL QUISTIAN, III ("QUISTIAN") to JESUS which indicated that JESUS planned to distribute pharmaceuticals to QUISTIAN. During the call, QUISTIAN asked JESUS, "What's the dealio?" JESUS later responded, "One or two." QUISTIAN further inquired, "One or two of the 80's [one or two bottles containing 80 mg tablets of oxycodone]?" JESUS responded, "Yes."

17. On October 7, 2007, at approximately 11:30 a.m., agents conducted surveillance at the target location when they observed QUISTIAN's black GMC sport utility vehicle arrive at the residence. Approximately 18 minutes later, QUISTIAN's vehicle was observed leaving the vicinity of JESUS and JUAN's residence. Surveillance of the vehicle was maintained until a SDPD unit conducted a traffic stop of QUISTIAN's vehicle for failing to signal while turning. During the stop, officers identified QUISTIAN as the driver of the vehicle and determined that QUISTIAN and the passenger had both been smoking marijuana that day. QUISTIAN was arrested for driving under the influence of marijuana and his vehicle was impounded. During an inventory search of the vehicle, officers found three bottles of oxycodone (each containing 100 80mg tablets), two regular-sized bottles of hydrocodone (each

containing 500 5mg tablets), and two large bottles of hydrocodone (each containing 1,000 10mg tablets).

- **October 12, 2007 – 4 Bottles of Hydrocodone and 4 Bottles of Oxycodone**

18. On October 12, 2007, JESUS sold four bottles of oxycodone (each containing 100 80 mg tablets) and four bottles of hydrocodone (each containing 500 10 mg tablets) to the CI for $13,000. The controlled purchase was surveilled and recorded. JESUS drove his 2005 Ford Mustang, bearing California license plate number 5MFE304, to the site of the controlled purchase and JUAN was in the passenger seat at the time of the deal.

- **October 13, 2007 – Pharmaceuticals stored at the target location**

19. On October 13, 2007, monitors intercepted a call between JESUS and JUAN. During the call, JESUS told JUAN, "Bring all that stuff [from the garage] in[side the house]. The paperwork and then my yellows [bottles of hydrocodone], put them in my closet . . . ." Later in the conversation, JESUS told JUAN, "Yeah, and I got you uh 3,000 yellows [hydrocodone], 1,000 of the white Vicodins five by five hundred [hydrocodone] and one 80 [one bottle of 80 mg oxycodone.]."

- **December 3, 2007 – 3 Bottles of Oxycodone**

20. On December 3, 2007, JESUS sold three bottles of oxycodone (each containing 100 80 mg tablets) to the CI for $7,500. The controlled purchase took place at the target location and both JESUS and JUAN were present during the deal. Agents observed JESUS arrive at the target location in a white, 2005, Ford Mustang, bearing California license number 5MFE904, registered to Juan E. Macias and Connie Macias. Agents had observed JESUS drive this vehicle during a previous controlled purchase on October 12, 2007.

- **January 23, 2008 – 2 Bottles of Oxycodone**

21. On January 23, 2008, JESUS sold two bottles of oxycodone (each containing 100 80 mg tablets) to the CI for $5,000. The controlled purchase took place at the target location and both JESUS and JUAN were present during the deal. During the deal, the CI inquired how JESUS could obtain the pharmaceuticals. The CI asked whether JESUS had a "hook up" [with the wholesalers]. JESUS responded "somewhat." JESUS stated that they just "over-order." The CI asked what happens if someone looked over the orders. JESUS replied, "if they do I'm fucked." JESUS further explained

that they only go over the orders when the orders are massive. JESUS said that if "the company" [believed to refer to the wholesaler] noticed a big change in the ordering pattern then they will send an e-mail to Fadi Atiya (the owner of the three San Diego pharmacies) asking what is happening. That is why JESUS can order "one a week."

- **January 26, 2008 – 2 Bottles of Oxycodone Stored at the Target Location**

22. On January 26, 2008, monitors intercepted a call between JESUS and JUAN regarding bottles of oxycodone that were stored at the target location. During the call, JESUS told JUAN, "I left two eighties [two bottles containing 80 mg tablets of oxycodone] right there in my room, in the Gucci shoe box." JUAN then asked, "How many?" JESUS then confirmed, "Two . . ." Jesus then stated, "I'll probably get on more today."

**JESUS' and JUAN's Connection to the Target Location**

23. JESUS and JUAN both reside at the target location. On October 31, 2007, agents obtained utility records from San Diego Gas and Electric (SDG&E) pertaining to the target location. The utility records indicate that JESUS maintains the SDG&E account for the target location. California DMV records indicate that JESUS resides at the target location. Vehicles known to be utilized by JESUS and/or JUAN have been observed on numerous occasions at the target location. JESUS and JUAN were both last seen at the target location on January 23, 2008.

**Vehicles Associated with JUAN and JESUS and Target Location**

24. On multiple occasions, agents observed JESUS driving a white 2005 Ford Mustang bearing California license plate number 5MFE904 registered in the name of his parents, Juan E. Macias and Connie Macias. JESUS drove the 2005 Ford Mustang during the sale of pharmaceuticals to the CI on October 12, 2007. Agents have also observed on numerous occasions JESUS driving a black 2003 Land Rover which is registered in his name. Agents have also observed the 2003 Land Rover at the target location. Based on wire intercepts, JESUS utilized the 2003 Land Rover to transport pharmaceuticals from Galloway Pharmacy to the target location on January 24, 2008.

9

25. On multiple occasions, agents observed JUAN driving a black 1988 Toyota truck bearing California license plate number 3P13894 registered to his parents, Juan E. Macias and Connie Macias. JUAN used the 1998 Toyota truck during controlled purchases of illegal pharmaceuticals with CI on July 27, 2007 and September 29, 2007.

## SEARCH PROTOCOL FOR COMPUTERS

26. This section describes the procedures that will be employed during this search to minimize the intrusion represented by the search of any electronic data found at the target location.

27. Searching agents will be asked to use an incremental approach in searching for relevant electronic material. If the agents are able to examine relevant portions of computer drives to identify responsive material within a reasonable time period on-site, then the agents will attempt to create forensic images of computers or laptops seized. However, if the agents cannot perform the search within a reasonable period on-site, will they employ alternate procedures to complete the review off-site. In that case, the computer expert will create forensic images of electronic data sources as necessary to complete the search off-site.

28. A forensic image is an exact physical copy of a computer hard drive or other similar electronic storage media. A forensic image thus captures all of the data on the hard drive (or other media) without the data being viewed and without changing the data in any way. There are many reasons why it is not feasible to conduct a forensic analysis of data on-site. First, analysis of the data following the creation of the forensic image is a highly technical process that requires specific expertise, equipment and software. Second, there are literally thousands of different hardware items and software programs that can be commercially purchased, installed and custom-configured on a user's computer system. Third, it is only after a thorough examination and analysis, that a trained computer forensic examiner can determine whether he needs to obtain specialized hardware or software (not to mention specialized training on the specialized software) in order to view and analyze the data contained in electronic form.

29. The analysis of data on a computer may also be an extremely tedious and time consuming process. In addition, to requiring special technical skills, equipment and software, it may take days to properly search a single hard drive for specific data. With current technology, each search

"hit" must be reviewed in its context by an agent to determine whether the data is within the scope of the warrant. In other words, merely finding a good "hit" does not end the review process.

30. Analyzing data on-site has become increasingly impossible as the volume of data stored on a typical computer system has increased. For example, a single gigabyte of storage space (i.e., 1,000 megabytes) is the equivalent of 500,000 double-spaced pages of text. Computer hard drives capable of storing 100s of gigabytes of data are becoming quite common in newer desktop computers.

31. In addition to the sheer volume, the data may be stored in a variety of formats or encrypted. The volume of data of course extends the time that it takes to analyze the image in a laboratory. Running keyword searches takes longer and results in more hits that must be individually examined for relevance. Moreover, certain file formats do not lend themselves to keyword searches (e.g., many common electronic mail, database and spreadsheet applications do not store data as searchable text).

32. Based on the foregoing, searching any computer or forensic image for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may require off-site analysis.

33. Nevertheless, all forensic analysis of the imaged data will be directed exclusively to the identification and seizure of information within the scope of this warrant. In the course of proper examination, the forensic examiner may view information that is potentially privileged or not within the scope of the warrant. If so, this information will not be made available to the investigating agents unless it appears to the examiner that the information relates to the commission of offenses not covered by this warrant. In that event, the examiner will confer with the investigator and/or the prosecuting attorney so that they can determine whether to seek a further search warrant for the newly uncovered data.

34. All seized computers shall be returned to the defendants or the defendant's agent within 10 calendar days. If agents need more time than 10 days to complete the mirror imaging, the Government will seek from the Court an extension of time within which to return the applicable devices and/or equipment.

### SEARCH PROTOCOL FOR CELLULAR TELEPHONES AND PDAS

35.  With respect to any and all electronically stored information in cellular phones or PDAs at the target locations, agents respectfully request that this Court authorize the agents to access, record, and seize the following:

    a.  telephone numbers of incoming/outgoing calls stored in the call registry;

    b.  Digital, cellular, and/or telephone numbers and/or direct connect numbers, names and identities stored in the directories;

    c.  Any incoming/outgoing text messages regarding violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, or 18 U.S.C. § 1956;

    d.  telephone subscriber information;

    e.  the stored telephone numbers dialed from the cell phone and/or PDA; and

    f.  any other electronic information in the stored memory and/or accessed by the active electronic features of the digital or cellular phone including but not limited to photographs, videos, e-mail, and voice mail regarding violations of 21 U.S.C. §§ 841(a)(1), 843(b), 846, or 18 U.S.C. § 1956.

36.  If the agents cannot analyze the cellular telephone or PDA on site, they may send the cellular telephone or DPA to the Regional Crime Forensic Lab (RCFL) or the DEA Digital Lab to all analysts or forensic examiners to examine, analyze, and make a record of the contents of the information stored in the seized cellular telephone or PDA.

### CONCLUSION AND SEALING REQUEST

37.  Based on my training and experience, consultation with other special agents and law enforcement officers, and all of the facts and opinions set forth in this affidavit, there is probable cause to believe that federal crimes have been committed, including controlled substances violations under 21 U.S.C. §§ 841(a)(1), 843(b), and 846, and money laundering violations under 18 U.S.C. § 1956. There is also probable cause to believe that property constituting evidence of the offenses, contraband, fruits of crime or things otherwise criminally possessed, and property designed or intended for use or which is or has been used as a means of committing the criminal offenses will be found in the target location described further in Attachment A.

38. Because this is an ongoing investigation and premature disclosure of the investigation could endanger agents and officers, cause the target subjects and others to flee and cause destruction of evidence, I request that this affidavit, the application for the search warrant, the search warrant, and all other associated court records be sealed until further court ordered.

I declare under penalty of perjury that the foregoing is true and correct.

_____
CHRISTOPHER J. SEDMAK
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this ____ day of March, 2008.

_____
HONORABLE CATHY ANN BENCIVENGO
United States Magistrate Judge